**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
SERENA BHADURI,                                    :
                                                   :       Civil Case No.
                          Plaintiff,               :
                                                   :
            v.                                     :       **COMPLAINT**
                                                   :
GANNETT CO., INC. d/b/a USA TODAY,                 :
ESTEE CROSS, in her individual and                 :       <u>**Jury Trial Demanded**</u>
professional capacities, and ANNA RIDDLE, in       :
her individual and professional capacities,        :
                                                   :
                          Defendant.               :
------------------------------------------------------------X

      Plaintiff Serena Bhaduri hereby alleges, by and through her undersigned counsel, Wigdor

LLP, as and for her Complaint against Defendants Gannett Co., Inc. d/b/a USA Today ("USA

Today" or the "Company"), Estee Cross and Anna Riddle ("Defendants") as follows:

<u>**SUMMARY OF CLAIMS**</u>

      1.    A recent New York Times article titled <u>Pregnancy Discrimination Is Rampant</u>

<u>Inside America's Biggest Companies</u> states:

> **Whether women work at Walmart or on Wall Street, getting**
> **pregnant is often the moment they are knocked off the**
> **professional ladder.**[1]

      2.    In monster fashion, USA Today "knocked off the professional ladder" yet another

dedicated female employee for getting pregnant.

      3.    USA Today knows better.  USA Today is an American media institution which

claims to reach nearly three million readers daily, and whose stated "mission" is to "serve as a

---

[1]     https://www.nytimes.com/interactive/2018/06/15/business/pregnancy-discrimination.html

forum for better understanding and unity to help make the USA truly one nation."[2]  In August 2019, contrary to its stated mission, USA Today fired Ms. Bhaduri, a top-performing digital sales director, after she disclosed her pregnancy.

4.     USA Today engaged in this horrific discrimination knowing that earlier this year Ms. Bhaduri suffered a personal tragedy that no parent should have to endure.  Ms. Bhaduri and her family welcomed a baby boy in November 2018.  Tragically, her son died in January 2019.

5.     In February 2019, despite this awful loss, Ms. Bhaduri returned to her job in digital sales at USA Today.  Soon after her return, Ms. Bhaduri's direct supervisor, Estee Cross, cruelly accused Ms. Bhaduri of having a "negative" attitude that she claimed caused her coworkers to suffer "low morale."  Suggesting that Ms. Bhaduri appeared to act more negative, as compared to how she acted before the death of her son, or that this was a problem for supervisors at USA Today is appalling.  Of course, there was no suggestion that Ms. Bhaduri was underperforming because her sales remained at an exceptionally high level.  USA Today had no right to impose a term or condition of employment that required Ms. Bhaduri to uplift the morale of her coworkers because of Ms. Bhaduri's grief and loss.

6.     Worse, Ms. Cross singled out Ms. Bhaduri in a way that she had not done before her maternity leave, began micromanaging Ms. Bhaduri and subjected her to heightened and unwarranted criticism.  Ms. Cross, who started at USA Today in July 2016, previously had admitted to Ms. Bhaduri that she was the ***first pregnant employee*** that Ms. Cross had to manage at USA Today.  Based on the number of women in the workforce generally, this fact suggests that either Ms. Cross managed only men or curiously, female employees most likely to become pregnant, were simply not there.

---

[2]        https://marketing.usatoday.com/about

7.     Ms. Bhaduri complained about Ms. Cross's micromanagement and heightened criticism to Anna Riddle, another supervisor.  Ms. Riddle brushed aside Ms. Bhaduri's legitimate concerns.

8.     Ms. Cross's mistreatment of Ms. Bhaduri escalated to the point that she asked Michael Kuntz, the Chief Operating Officer ("COO") for USA Today's national business, if another position existed at USA Today that would not require her to work under Ms. Cross. Nothing was done.

9.     Ms. Cross became infuriated when she heard that Ms. Bhaduri had asked about a position outside her department.  Ms. Cross scolded Ms. Bhaduri for speaking to Mr. Kuntz and accused her of insubordination by not following the "chain of command."

10.     In May 2019, Ms. Bhaduri notified Patrick Colvin, a Human Resources Business Partner, that she intended to take a one-month bereavement leave to which she was entitled in order to grieve her son's passing.  Ms. Bhaduri was fearful, however, that Ms. Cross would be upset at her decision to take this leave.  Incredulously, Mr. Colvin agreed that Ms. Cross would be unhappy and advised Ms. Bhaduri to wait until he received confirmation about the terms of Ms. Bhaduri's leave before she told Ms. Cross.

11.     Days later, on May 31, 2019, Ms. Bhaduri's fears came to fruition as Ms. Cross inexplicably stripped Ms. Bhaduri of many of her high revenue clients, including the multimillion-dollar Carat Global ("Carat") account.  Adding insult to injury, Ms. Cross assigned Ms. Bhaduri's clients to a newly hired, single male employee, who did not have children.

12.     During her bereavement leave, Ms. Bhaduri learned that she was pregnant again. She feared that Ms. Cross and Ms. Riddle would discriminate and retaliate against her even more after they heard.  As she feared, after they learned about Ms. Bhaduri's pregnancy, Ms. Cross and

Ms. Riddle ramped up their campaign of discrimination and retaliation against her in an effort to generate pretextual justifications for her eventual firing.  Ms. Cross and Ms. Riddle avoided Ms. Bhaduri, made it harder for Ms. Bhaduri to perform her job responsibilities, and set unrealistic expectations for Ms. Bhaduri.

13.     On August 13, 2019, just weeks after disclosing her pregnancy to USA Today, Ms. Riddle and Mr. Colvin fired Ms. Bhaduri.  Shockingly, Ms. Riddle said that the termination was based on Ms. Bhaduri's "negative attitude" which she alleged was contributing to a "toxic" workplace, while also vaguely asserting that Ms. Bhaduri "did not take direction well." Tellingly, Mr. Colvin confirmed that Ms. Bhaduri's termination was not related to performance.

14.     The reality is that USA Today did not want a female employee that might temporarily need time off.  It definitely did not want a female employee around who had taken maternity leave the year before, taken four weeks of bereavement after her infant son died, and was pregnant again.

15.     Several weeks after Ms. Bhaduri was fired, she learned that another female employee from her team, *a team with only 9 employees*, became pregnant and also was fired. This female employee had worked at USA Today for ten years and was considered an excellent performer.  It is unknown at this time whether a younger, unmarried male was hired to replace this pregnant employee, as in the case of Ms. Bhaduri.

16.     It is truly astonishing that USA Today would punish and shun Ms. Bhaduri at a time when she was most vulnerable, simply because it was potentially costly and inconvenient to continue employing a pregnant woman.

17.     USA Today violated the very laws put in place to protect employees such as Ms. Bhaduri.   Her  termination  is  but  another  clear  example  of  the  rampant  and  egregious

discrimination against pregnant employees that too often are treated as expendable second-class citizens in the workplace.

18.     Ms. Bhaduri brings this action seeking injunctive, declaratory and monetary relief against Defendants for violations of the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL").

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and City law pursuant to 28 U.S.C. § 1367(a).

20.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

21.     Plaintiff Serena Bhaduri is a former employee of USA Today who, at all relevant times, worked at USA Today's New York City office.  Ms. Bhaduri is a resident of the State of New York and, at all relevant times herein, met the definition of an "employee" under all relevant statutes.

22.     Defendant Gannett Co., Inc. d/b/a USA Today is a Delaware foreign business corporation with a principal place of business located at 7950 Jones Branch Dr., McLean, VA

22107.  USA Today also maintains an office at 1633 Broadway, New York, NY 10019.  At all relevant times, USA Today was an "employer" within the meaning of all applicable statutes.

23.     Defendant Estee Cross is a resident of the State of New York, Westchester County, and, at all relevant times, was a Vice President of Sales at USA Today, supervised Plaintiff's employment and met the definition of Plaintiff's "employer" under all relevant statutes.

24.     Defendant Anna Riddle is a resident of the State of New York, Kings County, and, at all relevant times, was the Northeast Director of Sales at USA Today, supervised Plaintiff's employment and met the definition of Plaintiff's "employer" under all relevant statutes.

## ADMINISTRATIVE PREREQUISITES

25.     Contemporaneously with the filing of this Complaint, Ms. Bhaduri will file a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").  As soon as the EEOC completes its investigation into Ms. Bhaduri's complaint and/or issues a Notice of Right to Sue, Ms. Bhaduri will seek leave to amend this Complaint to add Title VII claims against USA Today.

26.     Pursuant to NYCHRL § 8-502, Plaintiff has served a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, thereby satisfying the notice requirements of that section.

27.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

### I.   Background

28.    In October 2017, Ms. Bhaduri began working at USA Today and quickly became a top performer as a director in the digital sales department.

29.    By way of example only, Ms. Bhaduri originated and helped grow the Company's account with Carat, a London-based global media agency, and secured over $3,000,000 in digital sales revenue from Carat in her first year alone.

30.    In 2018, Ms. Bhaduri secured $4,500,000 in new digital sales revenue from Carat and a global media company called Mindshare.

31.    Ms. Bhaduri's hard work and dedication were recognized in July 2018 when she was named as one of USA Today's top salespersons.

32.    Throughout her employment, Ms. Bhaduri consistently received praise for her work and the revenue she generated.   Ms. Bhaduri also received exclusively positive performance reviews.

33.    There is no question that Ms. Bhaduri excelled in her position.  As any employee that works in sales understands, building personal relationships is critical.  Ms. Bhaduri is outgoing, friendly and social individual.  These characteristics allowed her to excel at work but also earned her many friends, and the respect of, her coworkers.

### II.   Ms. Bhaduri is Discriminated and Retaliated Against After She Returns from Maternity Leave

34.    When Ms. Bhaduri became pregnant in 2018, she and Ms. Riddle, now the Company's Northeast Director and one of Ms. Bhaduri's supervisors, discussed if her pregnancy would impact her employment status.  Ms. Riddle, who had been at USA Today since 2013,

responded that the Company was heartless and knowingly had terminated pregnant employees in the past.

35.    Notably, Ms. Cross, who started at USA Today in July 2016, told Ms. Bhaduri that she was the ***first pregnant employee*** that Ms. Cross had to manage at USA Today.  This fact suggests that employees predominantly were men, or, if female, were young, single and childless or beyond childbearing years.

36.    In November 2018, Ms. Bhaduri went on maternity leave.  She gave birth to a son later that month, but tragically he passed away on January 10, 2019.

37.    In mid-February 2019, Ms. Bhaduri returned to work and met with Michael Kuntz the COO for USA Today's national business.  Mr. Kuntz told Ms. Bhaduri to "take it easy" in her transition back to work and acknowledged that it would take some time for her to get back to full capacity.

38.    Despite her painful loss, Ms. Bhaduri reestablished herself as an asset to USA Today and began performing on par with or better than her peers.

39.    Sadly, following her return in February, Ms. Bhaduri's direct supervisor, Ms. Cross, singled out Ms. Bhaduri in a way that she had not done prior to November 2018.

40.    Specifically, Ms. Cross began to micromanage Ms. Bhaduri's work and subjected her to heightened and unwarranted criticism.

41.    Ms. Cross did not micromanage Ms. Bhaduri's coworkers.

42.    On March 14, 2019, after enduring Ms. Cross's harassing behavior for over a month, Ms. Bhaduri complained about Ms. Cross's conduct to Ms. Riddle.

43.     Ms. Bhaduri complained about the recent onset of Ms. Cross's micromanagement and the unwarranted criticism of her work.  In response, Ms. Riddle claimed to be unaware of any issues Ms. Cross had with Ms. Bhaduri.

44.     Ms. Cross's mistreatment of Ms. Bhaduri became so severe that Ms. Bhaduri asked Mr. Kuntz about other positions at USA Today that did not require her to work under Ms. Cross and whether he would be open to her pitching a new role if she could find a business need.

45.     Mr. Kuntz's initial response was that he was unaware of any open roles, but was open to hearing Ms. Bhaduri pitch new role ideas.

46.     Mr. Kuntz also said that Ms. Bhaduri should take her time "ramping up" since she was not expected to meet second quarter targets.  Contrary to what Mr. Kuntz said, Ms. Cross and Ms. Riddle repeatedly told Ms. Bhaduri that she was, in fact, expected to meet her second quarter targets.

47.     After meeting with Mr. Kuntz, Ms. Bhaduri prepared a presentation related to a new role at the Company that would place her outside of Ms. Cross's department.

48.     At the insistence of Patrick Colvin, Human Resources Business Partner, Ms. Bhaduri emailed the presentation to Ms. Cross for her feedback before sending it to Mr. Kuntz.

49.     Soon thereafter, Ms. Riddle told Ms. Bhaduri that there were no other positions available.  Ms. Riddle openly expressed her dissatisfaction about Ms. Bhaduri's request to Mr. Kuntz and made clear that there was a "chain of command" that started with her and then Ms. Cross.

50.     Subsequently, Mr. Colvin instructed Ms. Bhaduri to cancel an upcoming meeting with Mr. Kuntz.

51.     Despite being subjected to Ms. Cross's constant discriminatory treatment, Ms. Bhaduri continued to perform strongly.

52.     By way of example only, Ms. Bhaduri met 85% of her second quarter 2019 goals, which was on par with or better than many of her colleagues.  However, Ms. Cross and Ms. Riddle accused Ms. Bhaduri of not generating "enough" revenue.

53.     Outrageously, knowing about the tragic death of her infant son, Ms. Cross and Ms. Riddle claimed that Ms. Bhaduri had a "negative" attitude.

54.     It is abhorrent that Ms. Bhaduri's supervisors maligned her after the death of her infant son by judging her mood as being less cheerful when she came back to work in February. For a parent, the death of a child is considered to be one of the most painful events that an adult can experience.[3]

55.     Suggesting that Ms. Bhaduri appeared to act more negative, as compared to how she acted before the death of her son, or that this was a problem for supervisors at USA Today is appalling.  There was no suggestion that Ms. Bhaduri was underperforming because her sales remained at an exceptionally high level.  USA Today had no right to impose a term or condition of employment that required Ms. Bhaduri to uplift the morale of her coworkers because of Ms. Bhaduri's grief and loss.

56.     Expecting Ms. Bhaduri to perform at the same capacity, which she did, just weeks after her son's death, is questionable enough.  Also expecting that she edify the social mood of her team members is reprehensible.

---

[3]      https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2841012/;
https://www.compassionatefriends.org/grief/

### III.   Ms. Bhaduri is Further Discriminated and Retaliated Against After She Takes Bereavement Leave

57.     When she returned from maternity leave, Mr. Colvin told Ms. Bhaduri that she was eligible to take a one-month bereavement leave in 2019 to grieve her son's passing.

58.     In mid-May 2019, Ms. Bhaduri told Mr. Colvin that she intended to take bereavement leave in the coming weeks, but expressed fear that this would cause Ms. Cross to be upset.

59.     Mr. Colvin openly agreed that Ms. Cross would be unhappy about the bereavement leave and advised Ms. Bhaduri not to tell Ms. Cross until he received further confirmation about the terms of the bereavement leave from his supervisor.

60.     Ms. Bhaduri's suspicions became reality when just days later, on May 31, Ms. Cross inexplicably stripped Ms. Bhaduri of many of her high revenue clients, including the multimillion-dollar Carat account.

61.     Adding further insult to injury, Ms. Cross assigned Ms. Bhaduri's former clients to a newly hired, single male employee who did not have children.

62.     After Ms. Bhaduri returned from bereavement leave on July 8, Ms. Riddle presented her with a revised list of client assignments.

63.     Most of the clients listed were new clients and only a few had been clients with whom Ms. Bhaduri had worked before her bereavement leave.   Notably, several lucrative accounts that Ms. Bhaduri helped originate and develop, including Carat, were not returned to her.

64.     Additionally, the clients that were assigned to Ms. Bhaduri had generated little to no revenue in previous years.  While Ms. Bhaduri would later be reassigned two of her old lower

Case 1:19-cv-10789-GBD   Document 1   Filed 11/21/19   Page 12 of 22

revenue clients as a result of her hard work and dedication, Ms. Bhaduri was denied all of the high revenue clients whom she helped procure.

65.     Clearly, Ms. Bhaduri was being set up to fail and miss her target revenue numbers.

## IV.     Ms. Bhaduri's Employment is Terminated Because She is Pregnant and Would Need to Take Maternity Leave

66.     While on bereavement leave, Ms. Bhaduri learned that she was pregnant once again.

67.     In mid-July 2019, Ms. Bhaduri notified Mr. Colvin that she was pregnant, and asked about maternity leave and FMLA policies and about the possibility of extending her leave by an additional four to eight weeks.

68.     Because of the mistreatment she received at the hands of Ms. Cross and Ms. Riddle after her return from maternity leave in February 2019, and then in connection with her bereavement leave (particularly in comparison to her peers), Ms. Bhaduri was concerned about increased discrimination and retaliation based upon her pregnancy and upcoming maternity leave.

69.     Sadly, Ms. Bhaduri's fears were realized as Ms. Cross and Ms. Riddle ramped up their campaign of discrimination and retaliation against her in order to generate pretextual justifications for terminating her employment.

70.     On July 22, 2019, before Ms. Bhaduri told Ms. Cross and Ms. Riddle that she was pregnant, the New York sales team held a meeting during which Mr. Kuntz accused team members of displaying a "negative" attitude and having "low" morale.

71.     Mr. Kuntz asked each salesperson to explain why morale was low and why team members had negative attitudes.

72.     Notably, Mr. Kuntz acknowledged that Ms. Bhaduri could not meaningfully contribute to the discussion given that she had just returned from leave, and thus was not the cause of the negativity or low morale.

73.     On July 25, 2019, Ms. Bhaduri told Ms. Cross that she was pregnant again and due to give birth in January 2020.

74.     Later that day, Ms. Bhaduri emailed Ms. Riddle and asked to meet with her, with the intention of disclosing her pregnancy in person.

75.     Uncharacteristically Ms. Riddle failed to respond until July 30, and agreed to meet on July 31, 2019.

76.     At that July 31, 2019 meeting, Ms. Bhaduri told Ms. Riddle about her pregnancy and said that she needed to work from home on Friday, August 2 due to a doctor's appointment.

77.     Incredulously, rather than congratulate Ms. Bhaduri, Ms. Riddle pressed Ms. Bhaduri about why she had not informed her earlier of her pregnancy and accused Ms. Bhaduri of insubordination.

78.     Days later, on August 2, Ms. Cross emailed Ms. Bhaduri to ask if she was in the office.

79.     Ms. Bhaduri responded by telling her that she was working from home because of a doctor's appointment which was related to her pregnancy, and that she had told Ms. Riddle about the appointment.  Ms. Cross did not respond.

80.     On August 5, 2019, Ms. Cross abruptly canceled a previously scheduled meeting with Ms. Bhaduri.  On August 7, 2019, Ms. Riddle canceled a previously scheduled one-on-one meeting with Ms. Bhaduri.

81.     Ms. Bhaduri learned that Ms. Cross did not cancel her previously scheduled one-on-one meetings with Ms. Bhaduri's other colleagues.

82.     On August 10, 2019, Ms. Cross posted a job opening for a Senior Account Executive position on her LinkedIn profile, which was the same position Ms. Bhaduri held.

83.     On August 12, 2019 after repeatedly ignoring her, Ms. Riddle finally agreed to have a one-on-one meeting with Ms. Bhaduri, at which time she admonished Ms. Bhaduri for supposedly not having "enough" meetings scheduled on her calendar, and told her she was required to have ten to twelve meetings or work-related social outings scheduled per week.

84.     Ms. Bhaduri noted that it would be difficult for her to schedule this number of meetings each week because of doctor's appointments related to her pregnancy.

85.     This caused Ms. Riddle to become visibly angry.

86.     Ms. Bhaduri told Ms. Riddle that given her past medical history, she had to be cautious about her pregnancy and visit her doctor often.

87.     There is no question that Ms. Bhaduri's supervisors understood that because of her pregnancy, she would need to be accommodated for numerous doctors' visits. Because of what had happened with her son, Ms. Bhaduri's doctors were over-cautious about this pregnancy and required her to submit to more tests and examinations than the average pregnant woman.

88.     Ms. Cross was aware that the heightened monitoring of her status would cause Ms. Bhaduri to be out of the office during the week more than a non-pregnant employee or a non high-risk pregnant employee.

89.     The very next day, August 13, Ms. Bhaduri's employment was terminated during a meeting with Ms. Riddle and Mr. Colvin.

90.     Ms. Riddle claimed that the termination was due to Ms. Bhaduri's "negative attitude," which she alleged was contributing to a "toxic" workplace.

91.     Having recently been obligated to accommodate Ms. Bhaduri's maternity leave in 2018, plus the four weeks of bereavement leave in June – USA Today opted to discard Ms. Bhaduri and replace her with a single, unmarried man, that undoubtedly they hoped would not require many doctors' visits.

92.     Ms. Riddle also vaguely asserted that Ms. Bhaduri "did not take direction well." Tellingly, Mr. Colvin conceded that Ms. Bhaduri's termination was not performance related.

93.     Several weeks after Ms. Bhaduri was fired, she learned that another female employee from her team, *a team that had only nine employees*, became pregnant and also was fired.  This female employee had worked at USA Today for ten years and was considered an excellent performer.  It is unknown at this time whether a younger, unmarried male also was hired to replace this pregnant employee, as in the case of Ms. Bhaduri.

### FIRST CAUSE OF ACTION
**(Interference and Retaliation under the FMLA)**
***Against Defendant USA Today***

94.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

95.     At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA.  Similarly, at all times relevant herein, USA Today was and is a "covered employer" within the meaning of the FMLA.

96.     By the actions described above, among others, Defendant USA Today interfered with Plaintiff's rights under the FMLA and retaliated against Plaintiff on the basis of her decision to exercise her rights under the FMLA.

97.     As a direct and proximate result of Defendant USA Today's unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

98.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

99.     Defendant USA Today's unlawful and discriminatory actions constitute reckless intentional, malicious, willful and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

## SECOND CAUSE OF ACTION
### (Discrimination Under the NYSHRL)
#### *Against All Defendants*

100.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

101.     By the actions described above, among others, Defendants discriminated against Plaintiff based on her gender and/or pregnancy in violation of the NYSHRL, including, but not limited to, by terminating Plaintiff's employment.

102.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

103.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

104.    Plaintiff is further entitled to an award of punitive damages as Defendants' unlawful conduct was and remains reckless, wanton and/or malicious.

### THIRD CAUSE OF ACTION
#### (Retaliation Under the NYSHRL)
***Against All Defendants***

105.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

106.    By the actions described above, Defendants retaliated against Plaintiff based on her protected activities in violation of the NYSHRL, including but not limited to, by terminating Plaintiff's employment.

107.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

108.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

109.    Plaintiff is further entitled to an award of punitive damages as Defendants' unlawful conduct was and remains reckless, wanton and/or malicious.

### FOURTH CAUSE OF ACTION
#### (Aiding and Abetting in Violation of the NYSHRL)
***Against Defendants Cross and Riddle***

110.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

111.    Defendants Cross and Riddle knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYSHRL.

112.    As a direct and proximate result of the unlawful conduct of Defendants Cross and Riddle in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

113.    As a direct and proximate result of the unlawful conduct of Defendants Cross and Riddle, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

114.    Plaintiff is further entitled to an award of punitive damages as Defendants Cross and Riddle's unlawful conduct was and remains reckless, wanton and/or malicious.

**FIFTH CAUSE OF ACTION**
**(Discrimination Under the NYCHRL)**
***Against All Defendants***

115.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

116.    By the actions described above, among others, Defendants discriminated against Plaintiff based on her gender and/or pregnancy in violation of the NYCHRL, including, but not limited to, by terminating Plaintiff's employment.

117.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

118.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

119.     The unlawful actions of Defendants were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Retaliation Under the NYCHRL)**
***Against All Defendants***

120.     Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

121.     By the actions described above, Defendants retaliated against Plaintiff based on her protected activities in violation of the NYCHRL, including, but not limited to, by terminating Plaintiff's employment.

122.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

123.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

124.     The unlawful actions of Defendants were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to

amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Aiding and Abetting in Violation of the NYCHRL)**
***Against Defendants Cross and Riddle***

125.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

126.     Defendants Cross and Riddle knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYCHRL.

127.     As a direct and proximate result of the unlawful conduct of Defendants Cross and Riddle in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

128.     As a direct and proximate result of the unlawful conduct of Defendants Cross and Riddle in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

129.     The unlawful actions of Defendants Cross and Riddle were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.    An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.    An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

E.    An award of punitive damages, in an amount to be determined at trial;

F.    An award of liquidated damages, in an amount to be determined at trial;

G.    Prejudgment interest on all amounts due;

H.    An award of Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

I.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: November 21, 2019
       New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _Jeanne Christensen_

Jeanne M. Christensen
Tanvir H. Rahman
Taylor J. Crabill

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:  (212) 257-6845
jchristensen@wigdorlaw.com
trahman@wigdorlaw.com
tcrabill@wigdorlaw.com

*Counsel for Plaintiff*